UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal No. 3:25-cr-00004-GFVT-EBA |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | **&** |
| DANIEL LEE FRANTZ, ) | **ORDER** |
| ) | |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Daniel Lee Frantz's Objection to Magistrate Judge Edward B. Atkins' Report and Recommendation [R. 49.]  For the following reasons, Frantz's Objections are overruled and his Motions to Dismiss are denied.

**I**

Judge Atkins' Report and Recommendation accurately details the factual and procedural background of the case.  The Court recounts the necessary facts below for the purpose of informing the fact-intensive nature of a criminal suppression analysis.  Frantz did not object to Judge Atkins' recounting of the factual background.

Officer Anthony Catania pulled over Daniel Lee Frantz on January 17, 2024.  [R. 38 at 12.]  Catania is a patrol officer and K-9 handler with the Frankfort Police Department ("FPD"). *Id.* at 4.  Prior to the stop, Catania received a call from FPD narcotics detectives.  These detectives told Catania that they were following a vehicle traveling from Louisville to Frankfort that they suspected was carrying narcotics.  *Id.* at 12.  Narcotics detectives McConnell, Blanton, and Baker earlier witnessed Frantz enter and leave a residence after allegedly purchasing a large quantity of drugs.  *Id.* at 12.  An unmarked officer followed Frantz's vehicle from Louisville and

contacted Catania to alert him that the vehicle had committed multiple traffic violations, including crossing over the double yellow line and speeding. *Id.* at 13–14. Based on the observations of the officer in the unmarked vehicle, Catania believed he had probable cause to stop the vehicle for traffic violations. *Id.* at 14.

Catania stopped Frantz, requested his license and registration, and asked whether Frantz had any narcotics in the vehicle. *Id.* at 16. Catania testified that Frantz was acting "combative, aggressive, [and] standoffish." *Id.* Catania testified that Frantz's behavior helped Catania "develop reasonable articulable suspicion beyond what we already had for a traffic stop for an open-air sniff of the vehicle" with a drug-detection dog. *Id.* Catania asked Frantz to step out of the vehicle. *Id.* at 18. Catania testified that Frantz "delayed" and "stalled" getting out of the vehicle but eventually exited the car and took him to the front of the police car to speak with another officer. *Id.* at 19. After exiting the vehicle, neither Frantz nor Catania closed the driver-side door. *Id.* at 18–19.

Catania then brought out Odin, a Belgian Malinois dog trained to detect cocaine, heroin, MDMA, and methamphetamine. *Id.* at 7–8. Catania described Odin as an "independent searcher" who typically "free scans" vehicles when searching for narcotics, albeit still leashed and under the control of Catania. *Id.* at 10–12. Odin entered the vehicle and was actively searching the interior of the vehicle for the scent of narcotics. *Id.* at 21. Catania described that "if [Odin] doesn't detect the order of narcotics or anything in a particular area, he's going to move on. So by him not even showing any interest in going into the whole back of the vehicle, which was full of stuff, which I would typically expect from him, he wanted to stay up in the front seat and was focused on those particular areas." *Id.* at 22. Catania noticed that Odin displayed several behaviors indicating that Odin detected the odor of narcotics, including staying

2

in the front seat, becoming rigid, freezing, and closed-mouth breathing. *Id.* at 22–23. Odin typically alerts to the presence of narcotics by sitting. *Id.* at 37–38. Through training and experience, Catania testified that there are other changes in behavior that can indicate Odin's detection of drugs. *Id.* at 38. Given that Odin was physically inside the vehicle, Catania clarified that it would have been difficult for Odin "to go into a sit position or anything like that" when he was actively inside the car and where he was "in an awkward position." *Id.* at 23, 58.

After determining that Odin had positively alerted to the presence of narcotics in the vehicle, officers began to search Frantz's vehicle. *Id.* at 60. Police searched the vehicle "bumper to bumper" and discovered a glass pipe with crystal residue and a scale in the back seat of the vehicle. *Id.* at 61–62. Police eventually found the narcotics in the hood of the vehicle. The entire search lasted almost an hour. *Id.* at 62.

A federal grand jury indicted Frantz on one count of knowingly and intentionally possessing with intent to distribute 50 grams or more of actual methamphetamine in violation of 21 U.S.C. § 841(a)(1). [R. 1.] Frantz moved to suppress the evidence seized from his vehicle during the stop on the basis that the stop and actions of the police violated the Fourth Amendment. [R. 16; R. 43.] Judge Atkins held an evidentiary hearing on August 7, 2025. [R. 35.] At the conclusion of the hearing, Judge Atkins directed the parties to file additional briefing on the evidentiary issues. [R. 38 at 72–73.] On October 10, 2025, Judge Atkins released an Order and Recommended Disposition denying a motion for a second evidentiary hearing and recommending that Frantz's suppression motions be denied, giving the parties fourteen days to file objections. [R. 47.] On October 24, 2025, Frantz filed his objection to Judge Atkins' Recommended Disposition. [R. 49.]

3

II

When a party files written objections to a Magistrate Judge's proposed findings and recommendations, the District Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge." *Id.* "A specific objection 'explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic.'" *United States v. Conley*, 290 F. Supp. 3d 647, 653 (E.D. Ky. 2017) (quoting *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007)).

Judge Atkins made four findings. First, Officer Catania lawfully stopped Frantz's vehicle. [R. 47 at 5–7.] Second, the open-air sniff of Frantz's vehicle did not violate the Fourth Amendment. *Id.* at 7–11. Third, that Officer Catania had probable cause to search Frantz's vehicle. *Id.* at 11–15. Fourth, Frantz's arrest was lawful. *Id.* at 15–16. Frantz objected to these findings in four ways. First, that the traffic stop was unlawful because Officer Catania lacked probable cause to initiate the stop. [R. 49 at 1–12.] Second, that Odin's entry into the vehicle was not instinctive, rendering it unlawful. *Id.* at 12–13. Third, that Odin never positively alerted to the presence of narcotics, thus eliminating any probable cause to search the vehicle. *Id.* at 13–15. Finally, that the fruit of the poisonous tree doctrine requires the suppression of all evidence seized from Frantz's vehicle. *Id.* at 15.

A

The Court first confronts whether Officer Catania had probable cause to stop Frantz's vehicle. The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. The Fourth Amendment's protections extend to "brief

4

investigatory stops of… vehicles" as well. *United States v. Luqman*, 522 F.3d 613, 616 (6th Cir. 2008). When a police officer makes a traffic stop, "the driver is seized within the meaning of the Fourth Amendment." *Brendlin v. California*, 551 U.S. 249, 251 (2007). A traffic stop, therefore, must be reasonable under the circumstances. *Whren v. United States*, 517 U.S. 806, 810 (1996). A traffic stop is reasonable where police have probable cause to believe that a traffic violation has occurred. *Id.* An officer's actual, subjective motivation for conducting a traffic stop is immaterial to the Fourth Amendment analysis so long as the officer had a legal basis to stop the vehicle. *Id.* at 813.

Police have probable cause to stop a vehicle for any traffic violation that they personally witness. Under the collective knowledge doctrine, police can also stop a vehicle for traffic violations witnessed by other officers and relayed to them. "It is well-established that an officer may conduct a stop based on information obtained by fellow officers." *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012). The collective knowledge doctrine "recognizes the practical reality that 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another.'" *Id.* at 766 (quoting *United States v. Hensley*, 469 U.S. 221, 229 (1985)). The collective knowledge doctrine applies whenever a responding officer executes a stop at the request of another officer who possesses the facts necessary to establish reasonable suspicion or probable cause. *Lyons*, 687 F.3d at 766. This rule avoids "crippling restrictions on law enforcement" by "imputing the investigating officer's suspicions onto the responding officer." *Id.*

The collective knowledge doctrine has inherent limits. An officer conducting a traffic stop based on collective knowledge must still execute the stop within the boundaries of the Fourth Amendment. *Id.* In applying the doctrine, the Sixth Circuit adopted a three-part test: "(1)

5

the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Id.* at 767 (citing *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010)).

Frantz asserts that Officer Catania did not have probable cause to stop Frantz because Catania did not personally witness Frantz commit any traffic violations. Relatedly, Frantz alleges that the collective knowledge doctrine does not apply in this case because "the traffic stop was based on a single observation made by one officer and relayed to another." [R. 49 at 10.]

Frantz misunderstands the controlling law on this matter. No case holds that a police officer can stop a motorist *only* if they *personally* and *individually* witnessed the motorist commit a traffic violation.[1] Indeed, the very existence of the collective knowledge doctrine throws cold water on this claim. It is well-established that police may rely on the collective knowledge doctrine to establish probable cause to stop a vehicle based on the observations of traffic violations by other officers communicated to the officer executing the traffic stop. *See United States v. Pendelton*, No. 3:15CR-00116-CRS, 2017 U.S. Dist. LEXIS 98326, at *10–12 (W.D. Ky. Mar. 16, 2017) ("Given that Officer Thompson had probable cause to believe a civil traffic violation occurred using the collective knowledge rule, the Court finds the traffic stop was legal"); *see Pacheco*, 841 F.3d at 390 (suggesting that officers could have stopped the

---

[1] Frantz provides no case law supporting this position. Instead, Frantz cites three cases repeating the well-established rule that police must observe a traffic violation before initiating a traffic stop. None of these cases hold that the collective knowledge doctrine does not apply to traffic violations. *See* [R. 49 at 4–5.] Indeed, no case on point has found that the collective knowledge doctrine precludes police from relying on the observations of other officers in making a traffic stop.

6

defendant's vehicle on the basis of an earlier traffic violation relayed to them by another officer).

The collective knowledge doctrine plainly applies to the facts of this case when analyzed through the lens of the three-part *Lyons* test. First, "the officer taking the action must act in objective reliance on the information received." 687 F.3d at 767. Frankfort police witnessed Frantz enter and leave a Louisville residence under the suspicion that he had purchased narcotics. [R. 38 at 12.] Unmarked FPD detectives tailed Frantz on his return to Frankfort, and staged multiple officers around Frankfort in order to interdict Frantz. *Id.* at 12–13. One of the officers in the unmarked cars relayed to Catania that Frantz had committed several driving infractions. *Id.* at 14. Catania then initiated the traffic stop based on the other officer's observations. *Id.* at 14, 42. Clearly, Catania acted in objective reliance on the information relayed to him by the officers that tailed Frantz from Louisville to Frankfort and who had positioned Catania and other officers around Frankfort in order to intercept Frantz.

The second part of the *Lyons* test requires the officer providing the information to have facts supporting the level of suspicion required. 687 F.3d at 767. In the case of a traffic stop, this would require the officer providing the information to have facts supporting probable cause to initiate a traffic stop. This too is present. Catania testified that Seargeant McConnell witnessed Frantz's careless driving, specifically articulating to Catania that Frantz had crossed over the double yellow line multiple times and exceeded the posted speed limit. [R. 38 at 13–14, 39.]

The third and final step of the *Lyons* test requires that the stop must be no more intrusive than would have been permissible for the officer requesting it. 687 F.3d at 767. Catania pulled Frantz over on the basis of traffic infractions. Seargeant McConnell could have pulled Frantz over for traffic violations. As to the deployment of Odin, the Sixth Circuit holds that a canine

7

sniff is not a search within the meaning of the Fourth Amendment so long as the canine team is lawfully present at the location where the sniff occurs. *United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012). In the context of a traffic stop, "law enforcement may bring a canine unit to the scene of an investigatory stop with no particular suspicion of drugs as long as the dog sniff does not prolong the investigatory stop beyond its purpose." *United States v. Davis*, No. 3:18-CR-25-PLR-HBG, 2019 U.S. Dist. LEXIS 227951, at *46 (E.D. Tenn. Oct. 4, 2019) (citing *Rodriguez v. United States*, 575 U.S. 348 (2015); *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)). Odin was lawfully present at the location and Seargeant McConnell could have brought Odin to the investigatory stop even with no particular suspicion of drugs. Additionally, Seargeant McConnell would have had articulable suspicion that drugs were in the vehicle based on his narcotics investigation of Frantz.[2]

    The officers who witnessed Frantz commit multiple traffic violations relayed that information to Officer Catania. The collective knowledge doctrine imputed that information onto Catania, who conducted a lawful traffic stop armed with probable cause that Frantz had committed a traffic violation. The collective knowledge doctrine is applicable where the traffic stop was based on the observations made by one officer and relayed to another. The Supreme Court's decision in *Whren* disqualifies Frantz's argument that the stop was pretextual and thus illegal, plainly holding that the "subjective intentions" of individual police officers play "no role in ordinary, probable-cause Fourth Amendment analysis."[3] 517 U.S. at 813. Officer Catania had probable cause to stop Frantz on the basis of the reported traffic violations relayed to him by

---

[2] Seargeant McConnell was the narcotics detective with the FPD who was in direct contact with Officer Catania regarding the ongoing narcotics investigation surrounding Frantz. [R. 38 at 39–40.]

[3] Frantz suggests in his Objection that the stop was illegal because it may have been pretextual, stating that "no effort was made to run a records check or prepare a citation" and that "within approximately one minute of initiating the stop, Officer Catania inquired as to whether there were illegal items in the car." [R. 49 at 11.]

other officers, in full satisfaction of the collective knowledge doctrine.

**B**

Frantz next challenges the constitutionality of the use of Odin, the drug dog. Judge Atkins found that the open-air sniff of Frantz's vehicle did not violate the Fourth Amendment. [R. 47 at 7.] Frantz advances two arguments on this point. First, he argues that Odin's entry into the vehicle was no instinctive and thus unlawful. [R. 49 at 12.] Second, he argues that Odin never positively alerted to the presence of narcotics, thereby robbing Officer Catania of the probable cause needed to begin the physical search of the vehicle. *Id.* at 13. The issue before the Court is whether the dog sniff violated the Fourth Amendment.

The Court briefly introduced the legality of open-air dog sniffs in Part A of the Opinion. "It is well-established that 'a canine sniff is not a search within the meaning of the Fourth Amendment,' but 'the canine team must lawfully be present at the location where the sniff occurs.'" *Sharp*, 689 F.3d at 618 (quoting *United States v. Reed*, 141 F.3d 644, 650 (6th Cir. 1998)). A trained narcotics detection dog's alert to the presence of drugs provides probable cause to search an entire vehicle. *Id.* (citing *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir. 1994)). "A trained canine's sniff inside of a car after instinctively jumping into the car is not a search that violates the Fourth Amendment as long as the police did not encourage or facilitate the dog's jump." *Id.* at 620. Police do not have an affirmative duty to close open windows or open doors of a vehicle before conducting an open-air sniff. *Id.* (citing *Lyons*, 486 F.3d at 373–74).

**1**

Frantz provides no support for his proposition that Odin's entry into the vehicle was facilitated by police. Frantz argues that Catania somehow facilitated Odin's entry into the car

9

because he "maintain[ed] control of [Odin] at all times" and that the "[f]ailure to redirect the canine from the open door cannot be deemed anything other than facilitating the canine's unlawful entry into the vehicle." [R. 49 at 13.] The Sixth Circuit dismissed this exact line of thinking in *Sharp*, holding that it is not "a Fourth Amendment violation for a dog to jump into a car on its own volition and instinct when sniffing for drugs." 689 F.3d at 620. Citing no case law, Frantz contends that Catania had a duty to redirect Odin from the open door. The case law holds the opposite of Frantz's position, because officers "[do] not have an affirmative duty to close" open windows or doors. *Id.* (citing *Lyons*, 486 F.3d at 373–74). The record before the court, and the applicable case law, requires the conclusion that Odin's entry was instinctual and not facilitated by the actions of Catania.

### 2

Next, Frantz argues that there was no probable cause to search Frantz's vehicle because Odin did not positively alert to the odor of narcotics. Frantz raises this objection on the basis that Odin did not alert based on his usual "sit" alert. [R. 49 at 13.] Frantz argues that Catania incorrectly determined that Odin alerted to the presence of narcotics by observing other changes in Odin's behavior. *Id.*

A drug-detection dog's positive alert provides probable cause, unless the defendant can present evidence undermining the dog's reliability. *Florida v. Harris*, 568 U.S. 237, 246–48 (2013) ("Evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.") The defendant may undermine that reliability by presenting evidence suggesting that the dog was improperly trained,

10

influenced by its handler, or otherwise unreliable in the particular search at issue. *Diaz*, 25 F.3d at 394–96.

The record reflects that Odin was well-trained and reliable. Catania testified that he and Odin trained at Ventosa Kennel in North Carolina and received their certification after completing a 240-hour course. [R. 38 at 30, 33–24.] The National Narcotics Detector Dog Association (NNDDA) certified the duo on April 25, 2024. *Id.* Catania testified that he trains Odin on a daily and weekly basis related to obedience, tracking, and detection. [R. 38 at 35.] Judge Atkins accurately summarized that records of Odin's training "indicates that Odin often exhibits changes in behavior exactly like that which Officer Catania testified that he observed during the search of Frantz's vehicle — e.g., becoming rigid, switching to closed-mouth breathing, and refusing to leave an area." [R. 47 at 12.]

The crux of Frantz's argument is that Odin could not have properly alerted because he did not signal using his usual "sit" response. There is no case law supporting Frantz's position that a certified narcotics detection dog's alert is only valid if done in the dog's "usual" way. Indeed, caselaw suggests that a dog's behavioral changes are a critical factor in assessing an alert's reliability. *See, e.g.*, *United States v. One Million, Thirty-Two Thousand, Nine Hundred Eighty Dollars in U.S. Currency ($1,032,980.00)*, 855 F. Supp. 2d 678, 703–05 (N.D. Ohio 2012) (finding that a drug-detection dog's challenged behavioral changes constituted a *bona fide* positive alert for contraband and provided probable cause for the search of a vehicle).

The circumstances of the alert support a finding that Odin positively alerted. Catania testified that Odin changed his behavior on the passenger side. [R. 38 at 53–54.] Police later found the narcotics hidden under the hood on the passenger side of the vehicle. *Id.* at 53. Catania testified that he looks for "a combination of different behaviors" including "closed-

11

mouth breathing… focusing in the front seat, [and] freezing responses multiple times." *Id.* at 38, 56, 58–59. Catania also testified that he noticed that Odin was not interested in "the back seat at all, which was full of junk" and that he never attempted to go in the back seat, indicating to Catania that Odin detected the presence of narcotics near the front of the vehicle. *Id.* at 58–59. Odin was in an "awkward position" and Catania saw him "lose his footing multiple times." *Id.* at 58. To require Odin to alert via his usual "sit" response would be an absurd requirement that the law does not demand.

Frantz finally suggests that it was illegal for police to search the entire vehicle and that the search unnecessarily lasted for almost one hour. *Id.* But this does not matter. Police may search the entire vehicle after establishing probable cause via Odin's positive alert. *United States v. Ross*, 456 U.S. 798, 825 (1982). Indeed, defense counsel agreed at the suppression hearing that "you're allowed to search the entire vehicle" after a positive dog response. [R. 38 at 61.] After the positive alert for narcotics, police had the full authority to search every nook and cranny of the vehicle.

### C

Frantz's final objection to Judge Atkins' Report and Recommendation is that the fruit of the poisonous tree doctrine applies in this case. The fruit of the poisonous tree doctrine bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure. *United States v. Gregory*, 497 F. Supp. 3d 243, 275 (E.D. Ky. 2020) (citing *United States v. McClain*, 444 F.3d 556, 564 (6th Cir. 2005). The fruit of the poisonous tree doctrine does not apply to any of the evidence obtained in this case. The Court found that probable cause supported both the initial stop of Frantz and resulting search of his vehicle. Both the initial stop and the search of the vehicle satisfied the Constitution's protections against unlawful searches

12

and seizures. Where there is no unconstitutional search or seizure, the fruit of the poisonous tree doctrine does not apply.

## III

Accordingly, and the Court being sufficiently advised, it is hereby ORDERED as follows:

1. Defendant Frantz's Objections to the Report and Recommendation **[R. 49]** is **OVERRULED**;

2. The Magistrate Judge's Recommended Disposition **[R. 47]** is **ADOPTED** as and for the opinion of this Court; and

3. Defendant Frantz's Motions to Suppress **[R. 16]** and **[R. 43]** are **DENIED**.

This the 18th day of November, 2025.

Gregory F. Van Tatenhove
United States District Judge