UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:25-cr-00004-GFVT-EBA-1 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| DANIEL LEE FRANTZ, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Daniel Frantz's Motion for Judgment of

Acquittal or, in the Alternative, a New Trial. [R. 93]. For the following reasons, the Court

**DENIES** Frantz's motion.

**I**

On January 17, 2024, members of the Frankfort Police Department received information

from a confidential informant that the defendant, Daniel Frantz, planned to travel to Louisville to

purchase narcotics. [R. 89 at 130]. In addition to this information, the informant told officers that

Frantz would be in a "tannish-colored van," consistent with police surveillance showing that

Frantz drove a tan-colored van. [*Id.*] The informant gave specific information that Frantz would

be meeting a female in Louisville at a halfway house. [*Id.*] At this point, the police decided to set

up a surveillance plan to follow Frantz's actions that day. [*Id.* at 130–33].

Just before nightfall, officers observed Frantz leaving his place of employment in the van

and driving onto I-64 in the direction of Louisville. [R. 90 at 117]. The officers observed Frantz

stop at a residence—the suspected halfway house—and pick up a female companion. [*Id.* at

118]. Frantz and the woman left and drove to a location on Slevin Street in Louisville. [*Id.*]

There, officers observed Frantz exit the car and enter the Slevin Street house, welcomed in by a

"black male." [*Id.*] Frantz stayed inside for about 20 minutes before returning to the van. [*Id.*] Frantz then drove to a second residence, where he and the female entered and remained inside for about 45 minutes to an hour. [*Id.* at 119]. Frantz and his companion then exited and returned to the car.

After leaving the second residence, Frantz returned to the halfway house and dropped off his female companion. [R. 89 at 137]. Frantz then drove to what Detective Brett Blanton described as a "church parking lot," where Frantz remained for approximately 20 minutes. [R. 90 at 120]. Detective Blanton testified that he saw "the reflection of the lights, like the hood being raised, and you could see the lights moving as if the hood was being raised. And then a short time after, it appeared the hood went back down." [*Id.* at 120]. Officer Joshua McConnell also testified that he saw a figure open and close the hood of the vehicle in the parking lot. [R. 89 at 137–38]. Both Blanton and McConnell testified that their efforts to remain concealed and the nighttime darkness made it difficult to get a crystal-clear view of what transpired, but both testified that they saw someone open and close the hood. [*Id.* at 138; R. 90 at 120]. McConnell testified that he inferred that Frantz opened and closed the hood because he was, at that point, the only individual remaining in the van. [*Id.*]

After this parking lot rendezvous, Frantz began his return trip to the Frankfort area. By this point, as many as four or five vehicles assisted in surveilling Frantz's return. [*Id.*] McConnell testified that Frantz deviated from the normal route back to Frankfort in effort to do a "heat check," which in McConnell's experience refers to when people traveling with narcotics take back roads to "see if somebody's following them, or if a car is tailing them." [*Id.* at 139]. McConnell testified that at this point he stopped tailing Frantz and began driving to the garage where Frantz left from earlier in the day, thinking that Frantz might head that way. [*Id.* at 140–

2

41]. His instincts were correct, and he ended up encountering "the tan van" on the road. [*Id.* at 141]. McConnell testified that Frantz was driving on the opposite side of the road and that McConnell had to swerve to avoid hitting the van. [*Id.*] At this point, McConnell radioed to marked units to inform them of the reckless driving. [*Id.* at 141–42].

Frankfort police officer Anthony Catania responded to the call. Catania was part of a group of officers "staged at different areas" to intercept Frantz once he arrived back in Frankfort. [R. 90 at 66]. Catania was the closest to Frantz and McConnell at the time that McConnell called in Frantz's erratic driving. McConnell's call witnessing erratic driving gave Catania probable cause to initiate the traffic stop. [*Id.* at 67]. Catania initiated the traffic stop and engaged with Frantz. Catania testified that Frantz was "evasive and not cooperative," and that in his experience as a police officer Frantz's "deceptive behavior and being . . . uncooperative is an indicator for me that he's trying to conceal something." [*Id.* at 71]. Catania's body-worn camera captured this interaction, and the United States played that video for the jury during the course of Catania's testimony.

Catania had a narcotics dog available and had the dog sniff around the van. Catania testified that the dog's change in behavior indicated a positive alert to the presence of narcotics in the van. [*Id.* at 78]. Catania and another officer, Sergeant Gonzales, began an exhaustive search of the van that lasted approximately 45 minutes. [*Id.* at 79]. The vehicle search netted drug paraphernalia including a scale with residual odor on it, several plastic bags concealed behind a car speaker, and a pipe. [*Id.* at 80]. During a search under the van's hood, Catania and Gonzales located a bag that contained methamphetamine. [*Id.*] Throughout Catania's testimony, the United States played the body-worn camera footage showing the hood search.

Officers arrested Frantz and transported him to the police department. Detective Blanton interviewed Frantz after Frantz signed a *Miranda* waiver form. [*Id.* at 125]. Blanton testified that Frantz "corroborated everything we saw on surveillance" and told the interviewing officers that "he was fronted one pound of meth" to sell. [*Id.* at 126]. Blanton further testified that Frantz provided information about his "plug" and showed officers his plug's contact information from his phone. [*Id.* at 127]. Blanton testified that the seized methamphetamine was "significantly more" than 50 grams, and that the other drugs found on Frantz indicated "distribution amounts," given that they were sorted into smaller bags and that officers found other items consistent with drug distribution in the van, such as the digital scale. [*Id.* at 129–31]. Blanton described the interview as laid back and conversational because the purpose of such interviews is to determine whether the suspect would be a good candidate to become a confidential informant. [*Id.* at 127–28]. The officers determined that Frantz would not be a good candidate for a confidential informant role and ultimately patrol units transferred Frantz to jail. [*Id.* at 128, 132].

On April 3, 2025, a grand jury returned a one-count indictment charging Frantz with the knowing and intentional possession with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1). [R. 1]. Trial commenced on February 17, 2026, and on February 19 the jury found Frantz guilty. [R. 79]. After granting two extensions of time to file post-trial motions, [Rs. 86, 88], Frantz filed the instant motion on April 10, 2026. [R. 93]. The government responded in opposition, [R. 99], and Frantz filed a reply brief in support. [R. 101]. The matter is thus ripe for adjudication.

**II**

Frantz, through counsel, filed a motion for judgment of acquittal or, in the alternative, a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively. [R. 93].

Frantz argues that the evidence at trial did not support his conviction. The Court addresses Frantz's Rule 29 and Rule 33 motions in turn.

A

After the government closes its case, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "After the jury has returned a guilty verdict, the court may set aside and enter an acquittal." *Id.* 29(c)(2). On review of a Rule 29 motion, the Court may not "independently weigh the evidence, nor judge the credibility of witnesses." *United States v. Paulus*, 894 F.3d 267, 275 (6th Cir. 2018). The Court views the evidence in the light most favorable to the prosecution and asks "whether . . . any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Emmons*, 8 F.4th 454, 477–78 (6th Cir. 2021) (citation modified). Accordingly, "the prosecution's proof need not remove every reasonable hypothesis except guilty." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994). "A defendant claiming insufficiency of the evidence bears a very heavy burden." *Emmons*, 8 F.4th at 478 (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)). Further, the Court draws all reasonable inferences in favor of the government, even where the evidence is circumstantial. *United States v. Carter*, 355 F.3d 920, 925 (6th Cir. 2004).

"The elements of a charge of possession with intent to distribute illegal drugs are: (1) the defendant knowingly, (2) possessed a controlled substance, (3) with intent to distribute." *United States v. Tatum*, 462 F. App'x 602, 605 (6th Cir. 2012). To prove that the defendant "knowingly" possessed methamphetamine, the defendant simply had to know that he possessed a controlled substance. *United States v. Stapleton*, 297 F. App'x 413, 426 (6th Cir. 2008). "Possession can be

5

proven either by evidence of actual possession or constructive possession." *United States v. Russell*, 595 F.3d 633, 645 (6th Cir. 2010). "To establish constructive possession, the evidence must indicate ownership, domain or control over the contraband itself or the premises or vehicle in which the contraband is concealed." *Id.* (citation modified). "Physical proximity to drugs, or mere presence in an area where drugs are found, is not sufficient." *Id.* The jury may find the defendant intended to distribute drugs by drawing inferences from the quantity and manner of packaging of the drugs, the presence of equipment such as a digital scale for the sale of drugs, drug purity, the presence of large amounts of cash, and the defendant's own words and actions. *See United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006); *United States v. Stewart*, 69 F. App'x 213, 216 (6th Cir. 2003); *see also* Sixth Circuit Pattern Jury Instructions § 14.01 (2025), Committee Commentary Instruction 14.01.

Frantz first argues that there is insufficient knowledge to support his conviction. [R. 93-1 at 10]. In essence, Frantz argues that the government's evidence did not prove that Frantz knew there was methamphetamine in the vehicle at the time of his arrest. In support of this argument, Frantz cites to *United States v. Grogan*, 133 F.4th 553 (6th Cir. 2025), for the position that an attenuated theory of constructive possession may be insufficient where the government cannot present evidence beyond mere proximity for the jury to infer constructive possession. [R. 93-1 at 11]. Frantz argues that the government failed to establish constructive possession based on a number of alleged evidentiary deficiencies. First, that police did not perform fingerprint or DNA analysis on the seized methamphetamine. [*Id.* at 12]. Second, that Frantz did not own the van and that the government did not show whether Frantz was in exclusive possession of the vehicle. [*Id.* at 12–13]. Third, that the methamphetamine was not in plain view when the officers began their search. [*Id.* at 13]. Fourth, that police never saw the methamphetamine in Frantz's hands. [*Id.* at

6

14]. Fifth, that officers could not definitively state that they saw Frantz placing methamphetamine under the hood of the van. [*Id.*]

None of Frantz's arguments are convincing when viewing the evidence in the light most favorable to the prosecution. It is completely immaterial whether the drugs were in plain view. Indeed, the concealed location of the methamphetamine under the hood of the car—paired with testimony that Frantz had sole possession of the car when officers observed someone opening and closing its hood earlier in the evening—suggests that Frantz constructively possessed the drugs by exercising control over both the methamphetamine and the vehicle where the methamphetamine was concealed. *United States v. London*, 2026 U.S. App. KEXUS 13904, at *23–24 (6th Cir. May 14, 2026). The jury was free to infer from the officers' testimony that Frantz, as the only remaining occupant of the vehicle, was in fact the person who opened the hood of the car in the parking lot before making his way back to Frankfort. Because officers later found the methamphetamine concealed under the hood, the jury was free to infer that Frantz himself had placed it there based off of the officers' testimony. It is also immaterial whether Frantz's fingerprints were on the methamphetamine packaging or whether officers saw him handle the packaging. On a theory of constructive possession, it is enough that he exercised control over the vehicle where the contraband was located. *Id.* at *24.

Frantz raises the argument that the government did not conclusively show whether Frantz had "exclusive possession" of the vehicle. Indeed, this was an issue in *Grogan.* There, the Sixth Circuit found that insufficient evidence existed to independently convict the defendant of possession where the defendant had loaned his car to his friends, where the car had been in the shop for several days before his arrest, where the police did not see Grogan with the drugs, where no one could confirm when the drugs entered the vehicle, and where the drugs were not in

plain view but rather concealed in a box in the center console. 133 F.4th at 565. But Frantz's reliance on *Grogan* is misplaced because the Sixth Circuit decided that case based on the fact that the government improperly relied on withdrawn proffer evidence during earlier plea negotiations. *Id.* ("Ultimately, we are assessing the impact of admitting what was essentially Grogan's drug-ownership confession."). The Court held that "even if the government's remaining evidence makes it implausible that anyone else owned the drugs, its heavy reliance on the proffer—a confession in which Grogan admits the drugs were his—undermines our confidence that the judgment was not substantially swayed by the error." *Id.* (citation modified).

Frantz's case is also distinguishable from *Grogan* on the facts. Here, officers testified that they witnessed Frantz manipulate the hood of the car in Louisville, allowing a permissible inference that Frantz placed something under the hood. Police found the methamphetamine concealed under the hood. The jury heard testimony that the amount of methamphetamine, the presence of a digital scale, and the presence of individual baggies was consistent with distribution, rather than personal use. In *Grogan*, there was a significant question about Grogan's use of the vehicle: the drugs were found during an inventory search of the car, an officer saw Grogan use the vehicle on a single occasion, and Grogan's ex-girlfriend told police that he used the car that day. *Id.* at 556–57. Here, the jury heard testimony that a confidential informant told police that Frantz would be driving to Louisville in a van to pick up drugs, corroborated by the fact that police surveilled Frantz driving that van to Louisville and back to Frankfort, consistent with the informant's tip. Police found drugs in that van, corroborating the confidential informant's detailed statements about Frantz's planned activities that day. *See United States v. Howard*, 2025 U.S. App. LEXIS 28388, at *7 (6th Cir. Oct. 28, 2025) ("As a basis for

knowledge, we presume that informants know more about a suspect's crimes when they provide detailed statements rather than conclusory accusations.").

And, of course, the jury heard testimony that Frantz made inculpatory statements to officers during his interview, whereas in *Grogan* the Court found that the government used improper proffer evidence to sway the jury's decision. Frantz states that his "uncorroborated statement . . . is insufficient to sustain the conviction alone." [R. 93-1 at 17]. But the government did not support the conviction based on the statement alone. Instead, the statement and the physical evidence, together, sustain the conviction. "All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." *Smith v. United States*, 348 U.S. 147, 156 (1954). In this case, the independent evidence—the confidential informant's accurate tip, one pound of methamphetamine found in the van's hood, the testimony about Frantz's manipulation of the hood, and the assorted drug distribution paraphernalia—corroborates the statements that Frantz gave to the police. The Court instructed the jury that they could independently decide whether to credit the government's claim that Frantz admitted certain facts. [R. 98 at 23]. Together, the independent evidence and Frantz's statements gave the jury a sufficient basis on which to sustain their conviction. *Smith*, 348 U.S. at 156.

Looking at the totality of the evidence, the jury had sufficient evidence to support its conclusion that Frantz knowingly possessed the methamphetamine with the intent to distribute it. The Court is satisfied that any reasonable trier of fact could find that the government proved the essential elements in this case. Frantz notes that alternative theories exist, such as the possibility that someone else put drugs in the car or that his confession to police may not have been related

9

to his January 17 trip to Louisville. But "the prosecution's proof need not remove every reasonable hypothesis except guilty." *Wright*, 16 F.3d at 1440. The evidence admitted at trial and considered by the jury supports the jury's conclusion that the government met all of the necessary elements. For these reasons, the Court **DENIES** Frantz's motion for a judgment of acquittal.

**B**

In the alternative, Frantz moves for a new trial pursuant to Rule 33. [R. 93-1 at 17]. "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 motions are ordinarily granted "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). Unlike a Rule 29 motion, on review of a Rule 33 motion the Court may "act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *Id.*; *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). Rule 33 is an extraordinary remedy, used sparingly and only where the Court has a firm conviction that a mistake has been made. *United States v. Turner*, 490 F. App'x 747, 754 (6th Cir. 2012). Disagreement with the jury, or a judicial preference for a different outcome on the same facts, is not enough. *Id.*

Frantz argues that the government's case heavily depended on the testimony of law enforcement and suggested that "insurmountable discrepancies" existed between the officers' testimonies and their investigative reports. [R. 93-1 at 17]. Frantz nitpicks individual instances of supposed inconsistencies during testimony and suggests to the Court that this requires a new trial, citing no legal authority. The Court addresses these discrepancies in turn.

10

Frantz first faults the officers for testifying that they witnessed "someone under the hood of the vehicle prior to Daniel leaving Louisville," a detail that they did not include in their investigative report. Defense counsel cross-examined the officers on this discrepancy at trial, so the jury was fully aware that this incongruity existed. *See, e.g.*, [R. 90 at 148–49]. Detective Blanton testified that neglecting to include minute-by-minute information in an investigative report is common, testifying that "sometimes, you know, we just unfortunately forget to do a supplement about minor things like that." [*Id.* at 149]. The Court is not convinced that the failure to include this detail in an investigative report warrants the extraordinary remedy of a new trial, particularly where defense counsel vigorously cross-examined the officers on this point in the presence of the jury. As with any witness, the jury could decide to credit the testimony or they could discredit it. That they apparently chose to credit it may not weigh in Frantz's favor, but it does not warrant a new trial.

Frantz next argues that the officers spoke to Louisville agents Ken Borders and Clayton Bunch, "a fact unknown until trial." [R. 93-1 at 18]. Frantz argues that this nondisclosure robbed him of the ability to speak with this officer and otherwise build his defense. [*Id.*] At the conclusion of trial, the United States provided additional requested discovery to defense counsel containing the text messages between the investigating officers and Borders and Bunch. [R. 99 at 11]. The text messages, attached to Frantz's motion, show a conversation sending halfway house's address and Google Maps location and then a separate thread asking Louisville officers to divert calls for suspicious vehicles because the officers were surveilling the area in unmarked cars. [R. 93-2].

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), criminal prosecutors have a constitutional duty to disclose material, exculpatory evidence. A *Brady* violation has three

11

elements: (1) the evidence at issue must favor the accused, (2) that evidence must have been suppressed by the state, either willfully or inadvertently, and (3) prejudice must have ensued. *McNeil v. Bagley*, 10 F.4th 588, 598 (6th Cir. 2021). Frantz does not argue how these messages favored him, why the government would have suppressed these messages, and whether any prejudice ensued. The government argues that the officers' communications do not undermine or contradict their testimony, do not refute Frantz's admissions, and do not provide any additional impeachment unaddressed at trial. [R. 99 at 12]. Frantz suggests that the messages show that Blanton "was well aware of the location and name of the residence of the unidentified female" without explaining what significance this has. [R. 93-1 at 18].

The Court does not find this "discrepancy" to be material and notes that the officers testified nearly two years to the date of the original investigation. *See* [R. 90 at 120] ("Again, this was two years ago, so I don't recall the exact sequence of events[.]") When presented with competing explanations, the simplest one is usually the correct one. It is more likely that the officers, testifying two years after the fact, could not remember the exact address of a location they surveilled one time than it is that the government concealed this evidence for some nefarious purpose. In any event, Frantz makes no attempt to run this discrepancy through the *Brady* test. It makes no material difference to the evidence whether the officers remembered the address of the halfway house in February 2026.

This is not a case where "the evidence preponderates heavily against the verdict." *Hughes*, 505 F.3d at 593. The totality of the circumstances in this case supports the finding of constructive possession. Frantz's own statements, coupled with constructive possession, more than demonstrate that the government met its burden at trial. The Court will  not disturb the

jury's verdict by granting a new trial. For these reasons, the Court **DENIES** Frantz's motion for a new trial.

**III**

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Frantz's Motion for Judgment of Acquittal or, in the Alternative, a New Trial **[R. 93]** is **DENIED**.

2. Sentencing in this matter remains scheduled for Wednesday, June 10, 2026, at 1:30 p.m. at the United States Courthouse in Frankfort, Kentucky.

This 4th day of June, 2026.

Gregory F. Van Tatenhove
United States District Judge